2006 OK CR 1

## Ricardo Virgo BLONNER, Appellant

v.

## STATE of Oklahoma, Appellee.

### No. 0–2004–1175.

Court of Criminal Appeals of Oklahoma.

Jan. 5, 2006.

Craig Corgan, Mary Bruehl, and Janet Chesley, Norman, OK, Attorneys for Defendant at evidentiary hearing.

Fern Smith, Greg Mashburn, Asst. District Attorneys, Oklahoma City, OK, Attorneys for the State at evidentiary hearing.

Janet Chesley, Capital Defense Counsel Norman, OK, Attorney for Appellant on appeal.

Fern Smith, Asst. District Attorney, Oklahoma City, OK, Attorney for Appellee on appeal.

### OPINION AFFIRMING ORDER OF TRIAL COURT ON CLAIM OF MENTAL RETARDATION AND ESTABLISHING PROCEDURE FOR THE RESOLUTION OF FUTURE MENTAL RETARDATION CLAIMS

C. JOHNSON, Judge.

¶ 1 Appellant, Ricardo Blonner, is currently charged with First Degree Murder in Oklahoma County District Court, Case No. CF 1999–6416. Following this Court's decision in *State ex. rel. Lane v. Bass*, 2004 OK CR 14, 87 P.3d 629, Appellant filed a Motion to Quash Bill of Particulars due to mental retardation and requested an evidentiary hearing on the issue. The Honorable Jerry Bass, District Judge, conducted an evidentiary hearing on October 12th–14th, 2004. At the conclusion of the hearing, Judge Bass found Appellant had not met his burden of proving, by a preponderance of the evidence, that he is mentally retarded, pursuant to the definition of mental retardation adopted by this Court in *Murphy v. State*, 2002 OK CR 32, 54 P.3d 556. The trial court's written Findings of Fact and Conclusions of Law were filed in the District Court and in this Court on November 17, 2004. Thereafter, Appellant filed this appeal.

¶ 2 In his sole proposition of error, Appellant claims the trial court erred in concluding Mr. Blonner had not met his burden of proving by a preponderance of the evidence that he is mentally retarded pursuant to the definition set forth in *Murphy v. State*, 2002 OK CR 32, 54 P.3d 556. After thorough consideration of this proposition, the record before us, the transcripts, exhibits, briefs and arguments of the parties, we have determined the trial court's ruling should be affirmed.

¶ 3 In *Murphy v. State,* 2002 OK CR 32, 54 P.3d 556, we adopted the following definition for mental retardation for individuals who allege they are not death penalty eligible for use in capital trials:

A person is "mentally retarded": (1) If he or she functions at a significantly subaverage intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others; (2) The mental retardation manifested itself before the age of eighteen (18); and (3) The mental retardation is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work.

It is the defendant's burden to prove he or she is mentally retarded by a preponderance of the evidence at trial. Intelligence quotients are one of the many factors that may be considered, but are not alone determinative. However, no person shall be eligible to be considered mentally retarded unless he or she has an intelligence quotient of seventy or below, as reflected by at least one scientifically recognized, scientifically approved, and contemporary intelligent quotient test.

This standard shall be used at all future and pending capital trials, until such time as it may be replaced by a suitable legislative enactment.

*Murphy,* 2002 OK CR 32, ¶ 31, 54 P.3d at 567. When a defendant seeks to have the issue of mental retardation resolved prior to his or her capital trial, the trial court "shall determine whether the Defendant has shown by a preponderance of the evidence that he or she is mentally retarded." *State ex. rel. Lane v. Bass,* 2004 OK CR 14, ¶ 14, 87 P.3d 629, 633. Either party may appeal from the trial court's ruling and this Court will apply the preponderance of the evidence standard on appeal and conduct a *de novo* review of the trial court's factual findings. *Id.,* 2004 OK CR 14, ¶ 15, 87 P.3d at 633.

¶ 4 Applying that standard and looking at the evidence *de novo,* we find the trial court's ruling should be affirmed. While Appellant presented some evidence suggesting he suffers from mental retardation, he did not show by a preponderance of the evidence that he met all three prongs of the definition for mental retardation. *Murphy v. State,* 2003 OK CR 6, ¶ 13, 66 P.3d 456, 458.

¶ 5 In response to *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), this Court attempted to structure a procedure to resolve capital defendants' claims that they cannot be executed because they are mentally retarded. This Court diligently worked to create a fair system that adequately protected the rights of the accused and the interests of the state. Now that we have seen the model adopted in *Murphy* and its progeny implemented and appealed, we see ways in which to improve the resolution of these claims. This Court, therefore, adopts the following procedure to be utilized to resolve future *Atkins* claims. To the extent the procedure set forth in this Opinion is inconsistent with or in conflict with *State ex.rel. Lane v. Bass,* 2004 OK CR 14, 87 P.3d 629 and *Murphy v. State,* 2002 OK CR 32, 54 P.3d 556, those cases are overruled and their procedures are superceded by the procedure outlined below.

¶ 6 In future capital trials, where the defendant claims mental retardation as a bar to the imposition of the death penalty, the defendant shall file his or her Notice of Intent to Raise Mental Retardation as a defense to the imposition of the death penalty and Motion to Quash Bill of Particulars due to Mental Retardation within sixty (60) days from the date the State of Oklahoma files its Bill of Particulars or from the date of arraignment, whichever is later. The Notice must be accompanied by an averment that the defendant has at least one I.Q. test showing a score of 70 or below, within the margin of error, setting forth the score and date of testing, in order for the defendant to be eligible to raise the issue of mental retardation. If the defendant fails to set forth this information meeting the eligibility require-

ment, the trial court should make a finding on the record that the defendant has not met the threshold for establishing mental retardation, and deny the Motion to Quash Bill of Particulars. After complete discovery on the issue is afforded both parties and within sixty (60) days from the date the Notice and Motion to Quash is filed, the trial court shall schedule a jury trial on the issue. If additional time to prepare for the trial on mental retardation is required, the trial court may schedule the trial later upon good cause shown.

¶ 7 If the defendant personally and affirmatively waives his or her right to a jury determination of mental retardation on the record, the issue may be tried to the bench and the hearing shall be conducted as set forth in *State ex.rel. Lane v. Bass*, 2004 OK CR 14, ¶ 14, 87 P.3d 629. The decision of the trial court following the bench trial shall be made in open court and memorialized by written Order Granting or Denying the Motion to Quash Bill of Particulars on grounds of mental retardation, filed in the District Court within ten (10) days, setting forth Findings of Fact and Conclusions of Law.

¶ 8 Jury trials on the issue of mental retardation will be conducted pursuant to the dictates of Okla. Const. Art. II, § 19 [1]. The trial court shall impanel a jury composed of twelve (12) jurors, summoned to determine the sole question of mental retardation. The court shall proceed to the selection of the jury in the manner provided by law, and the parties shall be afforded nine (9) peremptory challenges each, pursuant to 22 O.S.2001, § 655. The potential jurors should not be death qualified, because the sole issue to be determined is whether the defendant is mentally retarded. The jurors shall receive fees for attendance and mileage as is allowed by law.

¶ 9 It is the defendant's burden to prove, by a preponderance of the evidence, that he or she is mentally retarded, as defined in *Murphy v. State*, 2002 OK CR 32, ¶ 31, 54 P.3d 556, 566:

A person is "mentally retarded": (1) If he or she functions at a significantly sub-average intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others; (2) The mental retardation manifested itself before the age of eighteen (18); and (3) The mental retardation is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work.

It is the defendant's burden to prove he or she is mentally retarded by a preponderance of the evidence at trial. Intelligence quotients are one of the many factors that may be considered, but are not alone determinative. However, no person shall be eligible to be considered mentally retarded unless he or she has an intelligence quotient of seventy or below, as reflected by at least one scientifically recognized, scientifically approved, and contemporary intelligent quotient test.

Because it is the defendant's burden to prove he/she is mentally retarded, the defendant

---

1. Section 19 provides:

The right of trial by jury shall be and remain inviolate, except in civil cases wherein the amount in controversy does not exceed One Hundred Dollars ($100.00), or in criminal cases wherein punishment for the offense charged is by fine only, not exceeding One Hundred Dollars ($100.00). Provided, however, that the Legislature may provide for jury trial in cases involving lesser amounts. Juries for the trial of civil and criminal cases shall consist of twelve (12) persons; but in the trial of misdemeanors, proceedings for the violation of ordinances or regulations of cities and towns, juvenile proceedings, actions for forcible entry and detainer, or detention only, of real property and collection of rents therefore, and civil cases concerning causes of action involving less than Twenty-five Hundred Dollars ($2,500.00), juries shall consist of six (6) persons. In civil cases, and in criminal cases less than felonies, three-fourths (3/4) of the whole number of jurors concurring shall have power to render a verdict. In all other cases the entire number of jurors must concur to render a verdict. In case a verdict is rendered by less than the whole number of jurors, the verdict shall be in writing and signed by each juror concurring therein.

shall open first, present evidence first, and have the opportunity to present the first and last closing arguments to the jury. Each party may present witnesses relevant to determination of the issue of mental retardation. Evidence relating to the crime with which the defendant is charged is not admissible unless that evidence is specifically relevant to refute the defendant's evidence of mental retardation. Evidence relating to other crimes is admissible only to the extent it is relevant to refute the defendant's evidence of mental retardation. *Lambert v. State,* 2003 OK CR 11, ¶ 3, 71 P.3d 30. The jury's verdict must be unanimous. *See* Okla. Const. Art.II, § 19.

¶ 10 The jury shall be instructed as follows:

### JURY INSTRUCTION ON DETERMINATION OF MENTAL RETARDATION

You the jury have been empanelled to determine whether [insert name of Defendant] suffers from mental retardation as it is defined below.

You are advised that a person is "mentally retarded" if he or she functions at a significantly sub-average intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others. Intelligence quotients are one of the many factors that may be considered, but are not alone determinative.

In reaching your decision, you must determine:

(1) Is the defendant a person who is mentally retarded as defined in this instruction?

(2) Was the mental retardation present and known before the defendant was eighteen (18) years of age?

(3) Does the defendant have significant limitations in adaptive functions in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; aca-

demics; health and safety; use of community resources; and work?

If you find by a preponderance of the evidence that the answer to each of these questions is yes, then you must find the Defendant is mentally retarded and so indicate on your verdict form.

If you find the answer to any of the above questions is no, you must find the defendant is not mentally retarded and so indicate on your verdict form.

Preponderance of the evidence means more probable than not.

¶ 11 The following closing instruction shall be given the jury:

### MENTAL RETARDATION—CLOSING INSTRUCTIONS

The Court has made rulings in the conduct of the trial and the admission of evidence. In so doing the Court has not expressed nor intimated in any way the weight or credit to be given any evidence or testimony admitted during the trial, nor indicated in any way the conclusions to be reached by you in this case.

You are the judges of the facts, the weight of the evidence and the credibility of the witnesses. In determining such weight or credit you may consider: The interest, if any, which the witness may have in the result of the trial; the relation of the witness to the parties; the bias or prejudice, if any has been apparent; the candor, fairness, intelligence and demeanor of the witness; the ability of the witness to remember and relate past occurrences, and the means of observation, and opportunity of knowing the matters about which the witness has testified. From all the facts and circumstances appearing in evidence and coming to your observation during the trial, aided by the knowledge which you each possess in common with other persons, you will reach your conclusions. You should not let sympathy, sentiment or prejudice enter into your deliberations, but should discharge your duties as jurors impartially, conscientiously and faithfully under your oaths and return such verdict as the evi-

dence warrants when measured by these instructions.

There has been introduced the testimony of witnesses who are represented to be skilled in certain areas. Such witnesses are known in law as expert witnesses. You may consider the testimony of these witnesses and give it such weight as you think it should have, but the value to be given their testimony is for you to determine. You are not required to surrender your own judgment to that of any person testifying as an expert or otherwise. The testimony of an expert, like that of any other witness, is to be given such value as you think it is entitled to receive.

These instructions contain all the law, whether statute or otherwise, to be applied by you in this case, and the rules by which you are to weigh the evidence and determine the facts in issue. You must consider the instructions as a whole and not a part to the exclusion of the rest. You must not use any method of chance in arriving at a verdict, but base it on the judgment of each juror concurring therein.

After you have retired to consider your verdict select one of the jury as a foreman and then enter upon your deliberations. When you have agreed on a verdict, your foreperson alone will sign it, and you will, as a body, return it in open Court. Your verdict must be unanimous. Forms of verdict will be furnished. You will now listen to and consider the arguments of counsel which are a proper part of this trial.

¶ 12 The following verdict form shall be provided the jury:

### VERDICT FORM FOR JURY DE-TERMINATION OF MEN-TAL RETARDATION

IN THE DISTRICT COURT OF THE _____ JUDICIAL DIS-TRICT OF THE STATE OF OKLA-HOMA SITTING IN AND FOR _____ COUNTY

| | |
|---|---|
| THE STATE OF OKLAHOMA, Plaintiff vs. JOHN DOE, Defendant. | ) ) ) ) ) Case No. ____ ) ) ) ) |

VERDICT

We, the jury, empanelled and sworn in the above-entitled cause, do, upon our oaths, find as follows:

[insert name of Defendant] is more probably than not:

_____ Mentally retarded

_____ Not mentally retarded

_____

FOREPERSON

 ¶ 13 If the jury finds the defendant is mentally retarded, the trial court shall enter an Order in open court granting the Motion to Quash Bill of Particulars and the case shall proceed as a non-capital first degree murder case. If the jury finds the defendant is not mentally retarded, the trial court shall enter an Order in open court denying the Motion to Quash Bill of Particulars and the case shall proceed as a capital first degree murder case. If the jury is unable to reach a verdict, the trial court shall enter an order granting the Motion to Quash Bill of Particulars, finding the defendant to be mentally retarded. *Lambert v. State*, 2003 OK CR 11, ¶ 5, 71 P.3d 30. The trial court's Order, granting or denying the Motion to Quash Bill of Particulars, shall be filed in the District Court record within ten (10) days from the date of the jury's verdict.

 ¶ 14 Either party may file an appeal from a jury's verdict on mental retardation or from the trial court's decision on mental retardation. If the sufficiency of the evidence is challenged on appeal, this Court will review the evidence in the light most favorable to the prevailing party to determine whether a rational trier of fact could have found that the defendant met or failed to meet his burden of proving mental retardation by a preponderance of the evidence.

¶ 15 The party seeking to appeal shall file a notice of intent to appeal and designation of record with the trial court clerk within five (5) days from the date the Order granting or denying the Motion to Quash Bill of Particulars is filed in the District Court. The filing of the notice of intent to appeal in the Dis-

trict Court is jurisdictional and failure to timely file constitutes waiver of the right to appeal. The party seeking to appeal shall file the notice of intent to appeal, together with a copy of the trial court's written order being appealed, with the Clerk of this Court within ten (10) days from the date the notice is filed in the district court. *See* Rule 2.5 and 13.4, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2005).

¶ 16 To perfect the appeal, the Petition in Error, certified copy of the original record, transcript of proceedings and brief shall be filed with the Clerk of this Court within sixty (60) days from the date the trial court enters an order granting or denying the Motion to Quash Bill of Particulars.

¶ 17 The court reporter shall be required to expedite preparation of the record. Requests for extensions of time shall be considered in accordance with Rule 3.2(C), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2005). To ensure the appeal is perfected within sixty (60) days, the record and transcripts shall be completed and filed with the district court clerk, and immediately transmitted to the Clerk of the Court of Criminal Appeals and appellate counsel within forty (40) days of the entry of the trial court's order. If the record is not complete within forty (40) days of the trial court's order, a Notice of Non–Completion of Record shall be sent to the Clerk of the Court of Criminal Appeals, explaining the cause for delay. A show cause hearing in this Court may be scheduled.

¶ 18 The district court clerk shall prepare and file three (3) certified copies of all pleadings, instruments, and transcripts designated for inclusion in the appeal record within forty (40) days from the date of the order appealed from in the same manner provided for the preparation of a regular appeal and as set forth in Rules 2.2, 2.3 and 2.4; however, the due dates set forth herein shall control. The original transcript and one (1) certified copy of the record designated shall be filed with the Clerk of this Court; one (1) certified copy of the record and transcript shall be provided to the district attorney; and, one (1) certified copy of the record and transcript to either the Oklahoma Indigent Defense System, pursuant to Section 1362 of Title 22, or to the retained or other appointed counsel of record on appeal.

¶ 19 The Petition in Error shall be filed within sixty (60) days from the date the judge's ruling is pronounced in open court to invoke the jurisdiction of this Court. The Petition in Error must contain the following information:

(1) The type of appeal and the date the State filed its Bill of Particulars;

(2) The date the defendant gave Notice of Intent to raise Mental Retardation as a defense to the imposition of the death penalty;

(3) The date the Motion to Quash Bill of Particulars due to Mental Retardation was filed in the district court;

(4) The case number and the court from which the appeal is lodged;

(5) The date on which the [jury trial on mental retardation] [evidentiary hearing on mental retardation] was held;

(6) The date the Order granting or denying the motion to quash was filed in the district court and the name of the judge; and,

(7) The nature of relief being sought.

An Application for Accelerated Docket shall be filed with the Petition in Error. *See* Section XI, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2005). The Application shall be served on the adverse party within five (5) days from the date on which the Application is filed and must contain a certificate of service. *See* Rules 1.9(B) and 3.4(A), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2005). Upon the filing of the Petition in Error, this Court shall schedule the matter for oral argument.

¶ 20 The Response Brief shall be filed within twenty (20) days from the date the Appellant's brief is filed. *See* Form 13.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2005).

¶ 21 The Application and Response shall contain specific propositions of error, "brief explanation of the argument, specific references to the transcripts and/or record, and

appropriate citations of authority pertaining to the issue(s) raised. *See* Rule 11.5(B) and (C), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2005).

¶ 22 Oral argument shall be limited to fifteen (15) minutes to each side. The moving party shall be entitled to open and conclude the oral argument. At the conclusion of oral argument, this Court may issue its decision in open court or take the matter under advisement. If the decision is taken under advisement, this Court will issue a written order within ten (10) days from the date of argument.

¶ 23 If the jury renders a verdict finding the defendant is not mentally retarded and the defendant does not appeal, or the verdict is affirmed on appeal, the case shall proceed as a capital first degree murder case. The issue of mental retardation shall not be relitigated at the capital first degree murder trial. However, evidence of the Defendant's intellectual functioning and deficits may be presented as mitigating evidence during second stage proceedings if the jury finds the defendant guilty.

¶ 24 If the jury renders a verdict finding the defendant is mentally retarded, or the jury is unable to reach a verdict and the trial court grants the Motion to Quash Bill of Particulars, and the State does not appeal, or the verdict is affirmed on appeal, the case shall proceed as a non-capital first degree murder case.

¶ 25 This procedure shall be utilized in all future cases where the defendant raises mental retardation as a bar to the imposition of the death penalty.

## DECISION

¶ 26 The trial court's order denying Mr. Blonner's Motion to Quash the Bill of Particulars on grounds of mental retardation, as set forth in the Findings of Fact and Conclusions of Law, is hereby *AFFIRMED,* and this case is remanded to the District Court of Oklahoma County for further proceedings. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeal,* Title 22, Ch.18, App. (2006), the **MANDATE** is OR-

DERED issued upon the delivery and filing of this decision.

CHAPEL, P.J. and A. JOHNSON, J., concur.

LUMPKIN, V.P.J. concurs in results/dissents in part.

LEWIS, J. concurs in results.

LUMPKIN, V.P.J., concur in results/dissents in part.

¶ 1 I concur in the results reached in the Court's opinion, at least insofar as it affirms the District Court's decision. And I compliment Judge Bass for recognizing that there is a distinct difference between the very narrow class of individuals deemed ineligible for the death penalty by the U.S. Supreme Court in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), i.e., those who are mentally retarded, and others who may have learning deficiencies or even other types of mental or emotional problems.

¶ 2 But beyond that, today's decision is best regarded as an example of judicial activism and legislation spinning out of control, to which I must dissent. As such, it should serve as a wake-up call to the Oklahoma Legislature to craft mental retardation legislation that passes Constitutional muster but is also consistent with the will of the people.

¶ 3 Mental retardation issues have required this Court to exercise certain legislative functions out of necessity due to the timing of U.S. Supreme Court decisions, but the Court has now exceeded the role of the judiciary under the doctrine of separation of powers in our Republic. When *Atkins v. Virginia* was decided, a mental retardation claim raised in *Murphy v. State,* 2002 OK CR 32, 54 P.3d 556 was ripe for review and had to be addressed in light thereof, without legislative input. (A bill prohibiting the execution of the mentally retarded had been passed by the Legislature but was thereafter vetoed by then Oklahoma Governor Frank Keating.)

¶ 4 *Atkins* had determined that there is a "national consensus"[1] against executing the

---

1. Prior to *Atkins,* numerous defendants appearing before this Court had argued that there was a

mentally retarded, but it also noted "serious disagreement" about where you draw the line regarding who is in fact retarded: "Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Atkins*, 536 U.S. at 317, 122 S.Ct. at 2250. Thus, the States were left with the task of developing appropriate ways to enforce the constitutional restriction.[2]

¶ 5 We began that task in *Murphy*. However, because this is a five-judge Court without the necessary time, resources, personnel, or experience to ascertain the will of the people or the State's budgetary constraints, *Murphy* attempted to **temporarily** resolve the mental retardation issue raised while, at the same time, exercise some judicial restraint.[3] *Murphy* was a collaborative opinion that took a fairly moderate approach. While it required at least one IQ test of 70 or below in order to be eligible to be considered mentally retarded, it also adopted a preponderance of the evidence standard rather than a more stringent clear and convincing standard, as some states have. *Murphy* incorporated a jury instruction suggested by Judge C. Johnson. The case also required the fact-intensive issue of mental retardation to be decided by a jury. After all, the decision upon this issue could render the most heinous murderers ineligible for the death penalty. After reviewing state law and considering the potential impact on victims, it seemed sound to leave that decision with a jury of peers.

¶ 6 Unfortunately, the *Murphy* procedures have never been fairly tested and have since been in a state of never-ending flux.[4] It is no exaggeration to say that the case has been attacked whenever possible by those who did not originally agree with it, especially now when those who voted for *Murphy* are no longer sitting on this Court. The two-stage procedure has been replaced with several alternatives, although not the ones originally advocated by *Murphy's* dissenters. Today's decision applies a "margin of error" to what is arguably the most important aspect of Murphy, the 70 threshold I.Q. score. Indeed, in its haste to do away with all things *Murphy*, the opinion actually uses language saying it has been "overruled," at least insofar as it varies from today's opinion, thus adding more confusion to the trial bench as they seek to apply these complex procedures.

¶ 7 The Court's inability to adopt a procedure and exercise the self-discipline to stick with it disregards the Rule of Law and demonstrates why there is such an aversion to legislating from the bench. For when Courts begin crafting the law rather than interpreting it, we create chaos and skewed doctrines that are not in touch with the will of the people. Even worse, we fail to follow the Rule of Law and introduce politics where it does not belong.

---

"national consensus" against executing the mentally retarded. But, assuming that was true, where did the national consensus begin and end? Did the national consensus include only the overtly mentally retarded, i.e., moderately to severely mentally retarded individuals with I.Q.'s below 55? Or did it also include the mildly mentally retarded (55 to 70 I.Q.), who are often not obviously handicapped? And what about the statewide consensus? Where do Oklahomans stand on this issue? But, more importantly, of what relevance is a national consensus to the interpretation of Constitutional language?

2. Ideally, this would be a job for the state legislatures, not for the judiciary.

3. For example, our mental retardation definition paralleled that in *Atkins* and was to be used until "replaced by a suitable legislative enactment." Not wanting to further burden or confuse our overcrowded, under-budgeted courts, we opted for a two-stage proceeding, rather than something more complicated and expensive. Because the procedures would result in jurors hearing details of the crime, we built in three checks and balances: (1) mental retardation *could* be resolved before trial, by agreement of the parties; (2) *de novo* review by the trial judge following trial that was "not to be a mere rubber-stamping of the jury's factual determinations;" and (3) appellate review.

4. Today's opinion disingenuously states, "Now that we have seen the model adopted in *Murphy* and its progeny implemented and appealed, we see ways in which to improve the resolution of these claims." The truth, however, is that we have only implemented continuous change, and the District Courts have never been given an opportunity to settle into the rhythm of a known procedure that allows them to work out any problems that might arise in that procedure.

¶ 8 This is where we find ourselves today. The Court keeps "changing the rules," adding more procedures and loopholes that surely wreak havoc in pending trials. Indeed, the latest proposal requires a separate trial, jury, and appeal. The process is so micromanaged it literally makes one's head spin. In fact, it is difficult to find your way through today's opinion without getting a headache. Every conceivable contingency is addressed, not in the context of a real dispute, but in anticipation of a possible one. The Court goes so far as to tell prosecutors how they must try their cases. This oversteps our judicial role and arguably violates the separation of powers doctrine, in addition to potentially showing bias against the State's case.

¶ 9 This Court owes a duty to the law, the courts, the practitioners, and the citizens to provide a consistent, logical, legally sound body of law that all concerned may rely on as they make decisions and prepare for the future. Not this constant biorhythmic change in procedure because it seems right at the moment. And so, it will be interesting to see how the state's courts, district attorneys and federal courts in subsequent appeals will view this Court's mental retardation jurisprudence, for the Court's burgeoning mental retardation bureaucracy threatens to overwhelm the district courts, not to mention the attorneys who must wade through it. Personal opinions about the death penalty have arguably seeped into the process, and mental retardation has become a portal through which *non-retarded defendants* may escape, even those who have had juries reject their mental retarded claims. *See, e.g. Pickens v. State*, 2005 OK CR 27, 126 P.3d 612; *Lambert v. State*, 2005 OK CR 26, 126 P.3d 646; *Salazar v. State*, 2005 OK CR 24, 126 P.3d 625. I doubt this is consistent with the will of Oklahoma citizens or is a position the Oklahoma legislature would support. It is certainly not consistent with the role of the judicial branch of government to only adjudicate the cases and issues before the Court.

¶ 10 It is time for the Oklahoma Legislature to step up to the plate and reclaim the legislative role upon this issue. Should we really adopt a margin of error on this issue, so that the State must bear the trial and appeal costs of a person who cannot even produce one legitimate IQ score of 70 or below? Do we really want a separate trial on the issue of mental retardation, complete with a separate jury and appeals process? What does this do to the right of speedy trial? Do we really want to mandate that jurors deciding mental retardation are not death qualified, when we all know that jurors will likely know the consequences of their decision, regardless of whether it is overtly pointed out? [5] Do we really want to prevent the State from introducing evidence to the trier of fact that is relevant to the issue of mental retardation except to the extent that it "refutes" evidence the defendant has presented, thus allowing a defendant to keep out what might be the most powerful and relevant evidence that shows he or she is not mentally retarded?

¶ 11 Maybe we do and maybe we don't. But it seems to me it is the Legislature's job to answer these questions, after studying the issue, holding hearings, ascertaining the impact it will have on our courts, hearing from witnesses, surveying what the "statewide consensus" on this issue is, and debating the issue. Otherwise, we will have a similar situation as occurred in *Schriro v. Smith*, 546 U.S. ——, 126 S.Ct. 7, 163 L.Ed.2d 6 (2005). There, a federal appeals court began imposing conditions on Arizona trial courts concerning the issue of mental retardation before Arizona had even had a chance to apply its own chosen procedures.[6] But the Supreme Court ruled that the federal court had acted beyond its habeas authority and reminded the federal court that the Supreme Court had left it to the States to develop

---

**5.** For that matter, if the jury is not to be death-qualified, why is the Court legislating the granting of nine peremptory challenges for qualifying the jury? This is inconsistent. If it is truly a separate proceeding on the issue of mental retardation, then the procedures contained in 22 O.S. 2001, § 1175.4 relating to determination of competency are more appropriate.

**6.** Following *Atkins*, Arizona had passed mental retardation legislation. *See*, A.R.S. § 13–703.02.

appropriate ways to enforce the constitutional restriction.

¶ 12 The same is true here. This appellate court has no business imposing stringent controversial conditions on the lower district courts that have not been adopted or even considered by the Oklahoma Legislature.

¶ 13 As for Appellant's specific claim, it is clear that he experienced some type of learning disability as he progressed through school. But there is absolutely no evidence of mental retardation. Teachers may have assumed he fell into the classification of mentally retarded because he was assigned to the "special education program" due to the stated criteria for that program. However, it is not uncommon for students to be placed in special education for many reasons falling short of mental retardation.

¶ 14 Subsequent testing totally disproved Appellant's mental retardation claim. Dr. Call's testing revealed Appellant's IQ was 87, which was consistent with two prior administrations of the test, i.e., a 2002 score of 83, and 2001 score of 78. These tests *ipso facto* refute any claim of mental retardation under *Atkins,* which found mental retardation is a cognitive defect that is present from birth and is therefore not subject to significant change over time.

¶ 15 For these reasons, I concur in the affirmance of the decision of the District Court, but dissent to most of this opinion, which is really nothing more than advisory dicta,[7] as the issues addressed are not ripe for review or even presented for adjudication. And I hopefully await the response of the Oklahoma Legislature, which is needed now more than ever.

LEWIS, Judge, Specially concurs.

¶ 1 I concur with the result; however the state should not lose its option of seeking the bill of particulars if the jury cannot agree on a verdict in the mental retardation trial. I would require that another jury be impaneled on this issue.

---

7. Supposedly, this Court is precluded from issuing advisory opinions and has so held throughout our history. *See, e.g., Canady v. Reynolds,* 1994 OK CR 54, ¶ 9, 880 P.2d 391, 394 ("An advisory opinion does not fall within the Court's original or statutory jurisdiction"); *Matter of L.N.,* 1980 OK CR 72, ¶ 3, 617 P.2d 239, 240 ("This Court has consistently refused to issue advisory opinions"). However, as with so many other issues, it does not appear the law and precedent are any obstruction to the Court's desired results.